UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LIAM DOOLEY,                                    :
    Plaintiff,                           :
                                         :
v.                                              :          3:20cv1329 (MPS)
                                         :
ROLLIN COOK (COMMISSIONER) et al., :
    Defendants.                          :

**INITIAL REVIEW ORDER**

The *pro se* plaintiff, Liam Dooley, is a sentenced[1] inmate in the custody of the

Connecticut Department of Correction ("DOC") who is proceeding *in forma pauperis*.   He filed

this civil rights complaint pursuant to 42 U.S.C. § 1983 against former Commissioner Rollin

Cook, Garner Correctional Institution ("Garner") Warden Hannah, Dr. Gerald Valletta, Garner

Deputy Warden Egan, Garner Captain Hurdle, RN Cynthia Nadeau, Grievance Coordinator

Olsen, Medical Supervisor Mike Vitale, UConn Medical Students John and Jane Doe, and RN

Angel in their individual and official capacities. Compl. [ECF No. 1]. He alleges violations of

the Eighth and Fourteenth Amendment based on deliberate indifference to his medical needs; he

also asserts state common law claims of negligence and intentional infliction of emotional

distress.[2] He requests damages, a declaratory judgment, and an injunction.

---

[1]  The Connecticut DOC website reflects that Dooley was sentenced on April 11, 2016, to serve a twenty-five-year sentence. http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=378452. *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (court may "take judicial notice of relevant matters of public record.").

[2]  The court will not address the plausibility of Dooley's common law claims under Connecticut law because this initial review for purposes of 28 U.S.C. § 1915A is limited to federal law claims. Such state law claims may be addressed later by the defendants in a motion to dismiss or a motion for summary judgment.

For the following reasons, Dooley's Eighth Amendment claims will be permitted to proceed against some of the defendants in their individual and official capacities.

## I.       STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review each prisoner civil complaint and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Bell Atlantic*, 550 U.S. at 556).

Nevertheless, it is well-established that "[p]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.       ALLEGATIONS

Dooley, an inmate currently housed at Garner, has experienced pain and medical problems (ingrown toenails, bruising, and blood-filled blisters) from wearing certain footwear. ECF No. 1 at ¶ 21. His pain has resulted in his having to walk with a limp and has hindered his ability to exercise. *Id.*

Dooley alleges that on January 2, 2014, he was transferred to New Haven Correctional Center ("NHCC") where he was first barred from wearing normal "uniforms" with the exception of a safety vest. *Id.* Thereafter, on January 3, 2014, he was transferred to Garner Correctional Institution, where he was not allowed to wear proper attire, including footwear, for ten to fifteen days during a twenty-four-hour watch. *Id.* In late January 2014, Dooley was transferred to Northern Correctional Institution ("Northern"). *Id.*

At Northern, he was seen by prison physicians about an infection to his toe due to an ingrown toenail; he was provided with pain relievers and antibiotics and scheduled for a follow-up appointment that did not take place. *Id.* at ¶ 22. Other inmates, who had noticed that Dooley was struggling and limping due to his infected toe and bruising, gave him a pair of commissary sneakers. *Id.* at ¶ 23. However, in late March 2014, Dooley developed new blood-filled blisters on his big toes of both feet and sustained more pain due to ingrown toenails that were caused by the DOC commissary sneakers that he had received weeks earlier. *Id.*

On August 12, 2015, Dooley met with a podiatrist, who noted several problems with Dooley's feet and recommended removal of the ingrown toenail on the sides of his left big toe, and treatment for the blood-filled blisters on his big toes. *Id.* at ¶ 24. The podiatrist noted that it would be best for Dooley to refrain from wearing shoes from DOC and the commissary, and that he should seek a "sneaker pass" to purchase footwear from an outside vendor. *Id.*

3

Despite filing several inmate requests to be seen by a podiatrist, Dooley did not receive a second appointment and was brushed off by the medical department staff, who told him he was on the list to be seen. *Id.* at ¶ 25.

Eight months later, after suffering pain, visibly limping and forgoing physical activity, Dooley was seen on March 5, 2016, by medical staff, who noticed redness, tenderness, the presence of draining, a severe ingrown toenail, and impaired skin integrity. *Id.* at ¶ 26. The on-call physician was notified that immediate action was required but no follow-up appointment occurred. *Id.*

In April 2016, Dooley was transferred to NHCC for a month then transferred to MacDougall-Walker Correctional Institution until February 2018. *Id.* at ¶ 27. He made several requests for removal of his ingrown toenail, treatment for his blood blisters, and a "sneaker pass," but he never received the requested relief. *Id.*

He was subsequently transferred to Garner, where Nurse David Guy indicated that Dooley's scheduled UCONN medical appointments would be honored. *Id.* at ¶ 28. However, Dooley did not receive a UCONN podiatrist consultation in 2018. *Id.* at ¶ 29.

In 2019, after Dooley made an inmate request to the medical unit about bruising on his feet, he was called to the medical unit but the bruising had faded. *Id.* at ¶ 30. Nurse Ralph and Dr. Valetta instructed him to have the medical unit called when he had bruising in the future and to take Motrin. *Id.* However, Dooley never received any Motrin. *Id.*

Dooley continued to submit inmate request forms for several months until he was instructed to submit a CN9602 administrative remedies form. *Id.* at ¶ 31.

In June 2019, Dooley submitted a CN9602 Administrative Remedies form; he explained his pain and suffering and requested a podiatrist appointment and permission to purchase sneakers from an outside vendor. *Id.* at ¶ 32. He received a disposition that he was required to attach an inmate request from and fill out the CN9602 correctly (which appears to be signed by Nurse Nadeau). *Id.* & exs. J, K.

In July 2019, Nurse Michelle Doe noticed Dooley had bruising and blood blisters; she informed him he may need "foot guards" and that he may be flat footed. *Id.* at ¶ 33. He was placed on the list to be seen by Dr. Valletta. *Id.* at ¶ 33.

After sending more inmate requests forms and explaining to Captain Hurdle about his need to see Dr. Valletta, Captain Hurdle called Dr. Valletta on July 23, 2019. *Id.* at ¶ 34. Captain Hurdle told Dooley that medical staff would call him to be seen by Dr. Valletta, and that Dooley should ask a lieutenant or captain to have a picture taken of his injuries if he was not called to the medical unit. *Id.* Dooley was not called to the medical unit, and he had pictures taken of his injuries that evening. *Id.* After Captain Lugo approved that pictures could be taken, Correction Officer Strielkaukas photographed Dooley's injury while Nurse Angel observed. *Id.*

Thereafter, Dooley submitted a Freedom of Information ("FOI") request for release of the photographs and any related incident reports. *Id.* at ¶ 35.

On July 24, 2019, Dr. Valletta called Dooley to the medical unit where defendants John and Jane Doe attended while Dr. Valletta observed. *Id.* at ¶ 36. Dooley was informed that an appointment would be scheduled for him to see a podiatrist and to have an x-ray taken. *Id.* at ¶ 36.

On that same date, Dooley learned from the FOI Liaison that there were no photographs of his injured foot or any related incident reports. *Id.* at ¶ 37. Thereafter, Dooley spoke with Captain Hurdle, who asked him whether he was planning on filing lawsuit and that he should think "very hard" about what he was going to do. *Id.* Captain Hurdle then stated that the photographs had been disposed of. *Id.*

On July 29, 2019, Dooley submitted an inmate request to Grievance Coordinator Olsen about whether a grievance could be filed against Nurse Nadeau. *Id.* at ¶ 38. Olsen responded that Dooley could do so but suggested writing to Nurse Nadeau's supervisor prior to filing a grievance. *Id.* Thereafter, Dooley never received a response to his inmate request sent to Medical Supervisor Vitale, and his grievance about Nadeau was not returned. *Id.*

On August 13, 2019, Dooley sent an inmate request to Captain Capellaro to save video coverage on July 23, 2019, showing Officer Strielkaukas taking photographs of his injuries on that date. *Id.* at ¶ 39. He also sent inmate requests to Deputy Warden Egan about requiring RN Nadeau and others to abide by the rules and regulations and practices, and to make sure that his grievance filed against Nadeau was ruled upon. *Id.*

On August 14, 2019, Dooley was seen by Nurse Michelle Doe, who stated she would make sure that the doctor saw her report about Dooley's new blister; she also mentioned that Dr. Valletta should provide him with shoe inserts. *Id.* at ¶ 40.

On August 20, 2019, Dooley filed another grievance about his ongoing medical issues and pain. *Id.* at ¶ 41.

On August 24, 2019, he sent an inmate request for sick call about pain stemming from an inflamed ingrown toenail on his right big toe. *Id.* at ¶ 42.

On August 26, 2019, Nurse Guy saw Dooley and stated that his toe looked better and seemed to have healed. *Id.* at ¶ 43. He provided Dooley with Ibuprofen and alcohol wipes. *Id.* at ¶ 43.

On September 3, 2019, Dooley was called to the mental health unit by CSW Bush. *Id.* at ¶ 44. Dooley explained that he was having trouble obtaining responses from Warden Hannah, Deputy Warden Egan, and other medical staff. *Id.* Bush instructed him to write to RCOO Mike Greene or COO Rob Richeson about these issues. *Id.*

On September 5, 2019, Dooley received a response to his request for video preservation. *Id.* at ¶ 45. On September 9, 2019, his grievance dated August 20, 2019 was returned without disposition because he had checked the wrong box (which appears to be signed by Nurse Nadeau). *Id.* at ¶ 46, ex. O. Dooley resubmitted the grievance with the proper box checked, but he never received a response thereto. *Id.*

On September 20, 2019, when medical Supervisor Mike Vitale toured Dooley's unit, Dooley explained his situation with the grievances and the necessity for proper medical care for his injured foot. *Id.* at ¶ 47. Vitale wrote down Dooley's name and number and indicated that he may have shoe inserts for him. *Id.* Nothing came of this interaction. *Id.*

On September 21, 2019, Dooley sent Warden Hannah copies of this inmate requests and grievances and explained that Nadeau and Olsen had failed to respond to his grievances. *Id.* at ¶ 48. He sent a copy of this inmate request to Deputy Warden Egan, Counselor Supervisor Calderon, and Medical Supervisor Vitale. *Id.* He also wrote inmate requests to Nadeau and Olsen, inquiring about why they had refused to assist Dooley with his urgent matter. *Id.* He never received a response to any of these inmate requests.

On September 23, 2019, Dooley was sent to UConn Medical Center where he had a consultation with a podiatrist Hussain, who stated that she could not provide him with an answer about his bruising and blistering because Dooley had no bruising or blistering at that time. *Id.* at ¶ 49. Dr. Hussain urged Dooley to continue to wear the boots he was wearing even if prohibited from participating in exercise or sports. *Id.* The doctor also informed him that it was not her decision to approve a sneaker pass, which was up to DOC Custody. *Id.* at ¶ 51.[3]

On September 24, 2019 Dooley filed a Request for Reasonable Accommodations form, in which he sought approval by DOC Medical Department and DOC Administrative Department for an order for proper footwear from an outside vendor. *Id.* at ¶ 52.

On October 9, 2019, Dr. Valletta called Dooley to the medical unit for a corrective procedure for both sides of his left big toe. *Id.* at ¶ 53. The procedure was performed by attending assistants, Jane and John Doe, and overseen by Dr. Valletta. *Id.*

On October 28, 2019, Dooley received the response denying his Request for Reasonable Accommodations signed by Dr. Valletta on October 8, 2019, and by Warden Hannah on October 28, 2019. *Id.* at ¶ 50, ex. S. Warden Hannah delayed Dooley's ability to receive medical care by not conducting an investigation after she received his reasonable accommodation request because an investigation allegedly would have revealed that his request should have been granted. *Id.*

However, Dr. Valletta called Dooley to the medical unit to perform a corrective procedure to correct an abnormality that he had previously claimed did not exist. *Id.*

---

[3] Dooley appears to have misordered the paragraphs of his complaint as the second part of paragraph 51 appears to be a continuation of paragraph 49.

On November 15, 2019, Dooley was called to speak with Counselor Supervisor Calderon about the denial of his accommodations form. *Id.* at ¶ 51. Counselor Calderon stated he would be looking into Dooley's claim that Captain Hurdle disposed of his injury photographs due to his belief that Dooley would file a lawsuit.[4] *Id.* at ¶ 51. He also filed a CN9601 to request his medical records and a copy of his podiatry results. *Id.*

On December 27, 2019, Warden Hannah sent Dooley a letter stating that his request form intended for Commissioner Cook was forwarded to her and that she found no evidence of a violation of due process. *Id.* at ¶ 54.

On January 15, 2020, Captain Hurdle questioned Dooley about his family's calling officials about Captain Hurdle's not doing his job. *Id.* at ¶ 55. Captain Hurdle then started to insult Dooley and call him a liar who had fabricated claims about his foot injury. *Id.* Captain Hurdle also stated that there were never any photographs taken and that he had never authorized any photographs to be taken in his unit. *Id.* He threatened Dooley, stating that Dooley would be making "a big mistake" if he took any form of legal action. *Id.*

On February 7, 2020, medical staff called Dooley to the medical unit and informed him that they were instructed to take measurements of his feet and that the measurements would be sent to Captain Hurdle and RCOO Mike Green. *Id.* at ¶ 56.

---

[4] Dooley maintains that Captain Hurdle violated Article VIII of the United States Constitution. The court will construe Dooley's claim as asserting an Eighth Amendment violation against Captain Hurdle, because there are no Articles of the constitution that bear any relevance to Dooley's allegations about Captain Hurdle.

9

On April 12, 2020, Dooley asked his Unit Counselor Christaldi for a copy of Administrative Directive 6.9, and he discovered that DOC staff are supposed to save all photographs. *Id.* at ¶ 57.

On April 18, 2020, Dooley experienced swelling, redness and pain surrounding his big toe on his left foot where he had had the corrective procedure six months earlier. *Id.* at ¶ 58. He wrote an inmate request to the medical unit about his condition and a letter to Warden Hannah about Captain Hurdle's violation of Administrative Directive 6.9. *Id.*

On April 28, 2020, Counselor Christaldi informed Dooley that he had received a phone call from Deputy Warden Egan about Dooley's foot problem. *Id.* at ¶ 59. Counselor Christaldi listened to Dooley's explanation about his problem and expressed that he would relay the information to Egan. *Id.*

That same day, Dooley was called to the medical unit, where he showed the APRN his toe. *Id.* at ¶ 60. She informed him that the procedure performed by Jane and John Doe had not worked and he needed to have another procedure. *Id.* After completion of the corrective procedure, Dooley spent the next week going to the medical unit to have his toes cleaned and dressed by medical staff. *Id.*

On May 4, 2020, Deputy Warden Egan responded to his inmate request addressed to Warden Hannah, stating that he required further information about the time and location and people involved with the photograph taken on July 23, 2020. *Id.* at ¶ 61. He also indicated that corrective actions about correctional staff are not based on recommendations from the inmate population. *Id.*

By May 29, 2020, Dooley had not received a response from Egan after he sent him details about the photographs taken of his foot injury, and Dooley filed a grievance against Egan and Hurdle concerning alleged violations of his constitutional rights. *Id.* at ¶ 62.

## III.   DISCUSSION

Dooley asserts violations of the Eighth and Fourteenth Amendments based on alleged inadequate or delayed medical care. Because Dooley was a sentenced prisoner at the time of his alleged deprivations, his claims are analyzed under the Eighth Amendment, which applies to sentenced prisoners.[5] *See Darnell v. Pineiro*, 849 F.3d 17, 29-34, n.9 (2d Cir. 2017); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Dooley's allegations may also be construed to assert a claim of First Amendment retaliation against Captain Hurdle. The court will consider whether Dooley has alleged any plausible constitutional violations against the named defendants.

### A.   Personal Involvement

Dooley has not alleged any facts about RN Angel, who is named as a defendant in the case caption, except that Angel allegedly observed the photographs being taken of Dooley's bruising. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that

---

[5]   The Eighth Amendment "is applicable to the States through the Fourteenth Amendment." *Rhodes v. Chapman*, 452 U.S. 337, 344-46 (1981) (internal quotation marks and citation omitted). Dooley alleges a violation of his due process rights. However, to the extent he asserts separate claims based on deliberate indifference to his medical needs under the Fourteenth Amendment, such claims must be dismissed.

11

rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted). Because there are no facts to indicate that RN Angel was personally involved in the alleged inadequate or delayed medical treatment, the court will dismiss RN Angel from this action.

## B.   Eighth Amendment Deliberate Indifference to Medical Needs

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners," whether "manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976). (internal quotation marks and citation omitted). However, "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).   First, a plaintiff must show that the conditions, to which he is subjected "pose an unreasonable risk of serious damage to his health" and that the alleged deprivation of adequate medical care is "sufficiently serious." *Darnell*, 849 F.3d at 30; *Salahuddin*, 467 F.3d at 279; *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Where a prisoner receives some medical care, but that care is allegedly inadequate, the court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *See Salahuddin*, 467 F.3d at 279; *see also Ferguson v. Cai*, No.11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (collecting cases).

Second, a plaintiff must show that the defendant acted with subjective recklessness—that is, the defendant knew of and disregarded "an excessive risk" to plaintiff's health or safety.

12

*See Darnell*, 849 F.3d at 32; *Salahuddin*, 467 F.3d at 280. To know of and disregard an excessive risk to the plaintiff's health or safety, the defendant must be actually "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Salahuddin*, 467 F.3d at 281 (noting that the "charged official must be subjectively aware that his conduct creates [substantial] risk [of harm]").

Mere negligence on the part of a medical professional, even if it constitutes medical malpractice, cannot amount to a constitutional violation. *See Clay v. Kellmurray*, 465 Fed. Appx. 46, 47 (2d Cir. 2012); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."   *Chance*, 143 F.3d at 703; *accord Hathaway v. Coughlin*, 37 F.3d 63, 70 (2d Cir. 1994) ("Where the dispute concerns not the absence of help but the choice of a certain course of treatment, or evidenced mere disagreement with considered medical judgment, we will not second guess the doctors.").

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay." *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (citing *Salahuddin*, 467 F.3d at 280) (other citations omitted) (summary order). The court's objective "serious medical need inquiry can take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003). The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the

severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.*; *see also Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]") (internal citation omitted); *see also Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

As for the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin,* 467 F.3d at 280; *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate a prisoner's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

Some courts within this Circuit have concluded that pain and other problems resulting from an inmate being forced to wear institutional footwear are not sufficiently serious to satisfy the objective standard for a serious medical condition. *See Konstantopoulos v. City of New York*,

No. 16-CV-7754 (JMF), 2017 WL 4736741, at *2 (S.D.N.Y. Oct. 19, 2017) (dismissing claim that deprivation of specialized footwear caused him "extreme pain" and mental suffering) (citing cases); *Stevens v. City of N.Y,* 12 Civ. 3808, 2013 WL 81327 at *3 (S.D.N.Y. Jan. 8, 2013), *aff'd,* 541 F. App'x 111 (2d Cir. 2013); *Jones v. Ng*, No. 14 CIV. 1350 AJP, 2015 WL 998467, at *7 (S.D.N.Y. Mar. 5, 2015) (finding on summary judgment that plaintiff failed to establish that the deprivation of his "specially designed orthopedic support footwear" was sufficiently serious to satisfy the first prong of a deliberate indifference claim, although he had alleged that he suffered pain, swelling, and "daily walking impact trauma") (citing cases); *but see Walker v. Schriro*, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *14 (S.D.N.Y. Mar. 26, 2013) (denying motion to dismiss where plaintiff alleged deprivation of medically-authorized footwear caused injuries that required a hospital visit and prescription for painkillers; lack of special footwear rendered "certain prerequisites to prison life" difficult; and several prison physicians had recommended that plaintiff be allowed to wear supportive footwear).

Because Dooley's allegations assert that he experienced pain and increased damage due to the inadequate and delayed medical treatment for his foot problems, the court will assume for purposes of this initial review order that he has satisfied the objective element of the Eighth Amendment analysis. With respect to the subjective component, Dooley's allegations are sufficient for purposes of initial review to suggest that Dr. Valletta, Medical Students Jane and John Doe, Grievance Coordinators Nadeau and Olsen, and Medical Supervisor Mike Vitale acted with deliberate indifference to his medical needs. The court construes Dooley's allegations liberally, finding that they raise an inference that Captain Hurdle delayed Dooley's medical treatment by disposing of the photographs taken of Dooley's injuries that were to be provided to

the medical unit. Thus, the court will permit Dooley's Eighth Amendment claims to proceed against Dr. Valletta, Jane and John Doe, Grievance Coordinators Nadeau and Olsen, Medical Supervisor Mike Vitale, and Captain Hurdle.

###   C.   Threat from Captain Hurdle

Dooley has alleged that Captain Hurdle asked him whether he was planning on filing suit, that he should think "very hard" about what he was going to do, and that the photographs of Dooley's injury were disposed of. ECF No. 1 at ¶ 37. Dooley also alleges that Captain Hurdle later threatened him by stating that Dooley would be making "a big mistake" if he took legal action. *Id.* at ¶ 55. To the extent that Dooley is asserting a First Amendment retaliation claim, his allegations are insufficient.

"To prevail on a First Amendment retaliation claim, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019); *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted). To be an "adverse action," retaliatory conduct must be the type that would deter "a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted).

The Second Circuit has "instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d

290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)).

Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by

specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d

at 295 (internal quotations and citation omitted).

      Protected speech or activity includes filing a lawsuit, an administrative complaint, or a

prison grievance.  *See id.* ("It is well established that retaliation against a prisoner for pursuing a

grievance violates the right to petition [the] government for the redress of grievances guaranteed

by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation

marks and citations omitted); *Booth v. Comm'r of Corr.*, C.A. No. 19-CV-100 (MPS), 2019 WL

919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances

is protected activity.").   However, even assuming the first prong is satisfied, Dooley's

allegations do not establish the remaining elements of a First Amendment retaliation claim

through specific and detailed factual allegations.  Dooley's allegations are not sufficient to

suggest that either of Captain Hurdle's alleged verbal statements constitute adverse conduct.

Verbal threats may qualify as adverse action in the prison retaliation context where the threat is

sufficiently specific and direct. *Stapleton v. Pagano*, No. 19-CV-952 (KMK), 2020 WL

4606320, at *6 (S.D.N.Y. Aug. 11, 2020) (collecting cases) (quotation and citation omitted);

*Quezada v. Roy*, No. 14 Civ. 4056, 2015 WL 5970355, *21 (S.D.N.Y. Oct. 13, 2015) ("The less

direct and specific a threat, the less likely it will deter an inmate from exercising his First

Amendment rights"); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11

(S.D.N.Y. Sept. 28, 2018) (threats by correction officers that they were "gonna kill" plaintiff was

not sufficient). Captain Hurdle's comments fall in the category of vague threats or statements

that "would be insufficient to deter 'a similarly situated individual of ordinary firmness from

exercising his or her constitutional rights.'" *Hayes v. Dahlke*, 976 F.3d 259 (2d Cir. Oct. 5, 2020)

(quoting *Davis*, 320 F.3d at 353); *see also Hill v. Chalanor*, 128 F. App'x 187, 189 (2d Cir.

2005) (noting that threats "without any allegation that [the defendant] carried through on

those threats, did not constitute adverse action" for purposes of

a First Amendment retaliation claim). Here, Captain Hurdle's alleged statements about Dooley

needing to "think hard" or making a "big mistake" are too vague to constitute adverse action.

However, it is not clear whether the disposal of the photographs of an inmate's injury for

use in receiving medical treatment would deter a similarly-situated inmate of ordinary firmness

from exercising his constitutional rights, and the court will assume for purposes of this initial

review that this conduct satisfies the adverse action element. Nevertheless, Dooley has not

adequately alleged causation with facts indicating that Dooley's protected activity was a

substantial or motivating factor in the decision to dispose of the photographs. No specific or

detailed allegations suggest that Captain Hurdle actually disposed of the photographs (or had

them diposed of) to deter Dooley from filing litigation against him. Thus, the court concludes

that Dooley's allegations do not state a plausible First Amendment retaliation claim against

Captain Hurdle.

### D.      Supervisory Liability

Dooley names as defendants several supervisory defendants, Commissioner Cook,

Warden Hannah, and Deputy Warden Egan.

A plaintiff may only recover damages against a supervisory official by showing that the

official was "personally involved" in the constitutional deprivation in one of five ways: (1) the

18

official directly participated in the deprivation; (2) the official learned about the deprivation

through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated

a policy or custom under which unconstitutional practices occurred; (4) the official was grossly

negligent in managing subordinates who caused the unlawful condition or event; or (5) the

official failed to take action in response to information regarding the unconstitutional conduct.

*Wright*, 21 F.3d at 501; *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003); *Colon v.

Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).[6] In addition to satisfying one of

these requirements, a plaintiff must also establish that the supervisor's actions were the

proximate cause of the plaintiff's constitutional deprivation. *Raspardo v. Carlone*, 770 F.3d 97,

116 (2d Cir. 2014); *see also Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) (plaintiff must

show "an affirmative causal link" between the supervisor's involvement and the constitutional

injury.). A general allegation that a defendant failed to supervise subordinates is insufficient to

establish personal involvement without a factual connection between that supervisory

defendant's alleged failure and the alleged resulting harm to the plaintiff. *See Samuels v. Fischer*,

168 F. Supp. 3d 625, 639 (639 (S.D.N.Y. 2016) (citing cases).

Here, Dooley has sufficiently alleged facts to suggest that Warden Hannah and Deputy

Warden Egan had notice of Dooley's need for medical attention and their conduct or failure to

act may have contributed to the delay in his receiving the necessary medical attention. Thus,

---

[6] The Second Circuit has observed that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, without further Second Circuit guidance on this issue, the court assumes for purposes of this ruling that the categories outlined in *Colon* remain valid.

construing the facts liberally in favor of Dooley, the court will permit Dooley's Eighth

Amendment claims to proceed against Warden Hannah and Deputy Warden Egan on the basis of

supervisory liability.

Dooley's allegations indicate that he wrote to Commissioner Cook, Warden Hannah, and

Deputy Warden Egan about the Grievance Coordinators' failure to adjudicate his administrative

remedies. See ECF No. 1 at ¶¶ 39, 48, 54, ex. T. However, "inmate grievance programs created

by state law are not required by the Constitution, and consequently allegations that prison

officials violated those procedures do not give rise to a cognizable Section 1983

claim." *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations,

alterations, and quotation marks omitted). "Inmates have no constitutional entitlement to

grievance procedures, to receive a response to a grievance, or to have a grievance processed

properly." *Schlosser v. Manuel*, No. 3:19-CV-1444 (SRU), 2020 WL 127700, at *5 (D. Conn.

Jan. 10, 2020) (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (claim relating to

grievance procedures "confused a state-created procedural entitlement with a constitutional

right"; "neither state policies nor 'state statutes ... create federally protected due process

entitlements to specific state-mandated procedures'")). Accordingly, Dooley cannot state a

plausible constitutional claim against Commissioner Cook,[7] Warden Hannah and Deputy

Warden Egan based on their awareness of the failures by the Grievance Coordinators to act on

Dooley's grievances.[8]

---

[7] As this appears to be the only allegation concerning Commissioner Cook's involvement, the court will dismiss all claims for damages against Commissioner Cook.

[8] Likewise, Dooley cannot assert a plausible Section 1983 claim based on Captain Hurdle's alleged violation of Administrative Directive 6.9. A defendant's failure to comply with prison regulations or

E.      **Official Capacity Claims**

As an initial matter, any claims based on constitutional violations for money damages against the defendants, who are state employees, in their official capacities are dismissed as barred by the Eleventh Amendment. *See e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007).

However, this exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993). Thus, the court will dismiss Dooley's request for a declaration that the defendants have violated his rights in the past. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief."). Furthermore, judicial resolution of Dooley's claims in this case will determine whether any defendant has violated his rights.

Dooley's request for injunctive orders for Commissioner Cook, Warden Hannah, Dr.

---

administrative directives does not constitute a basis for relief under Section 1983 because "a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983." *Fine v. UConn Med.*, No. 3:18-CV-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019) (citation omitted).

Valletta, and Medical Supervisor Vitale to send him to see a vascular specialist as recommended by the UCONN podiatrist and for footwear from an outside vendor seeks prospective relief for alleged ongoing Eighth Amendment medical deliberate indifference. However, Dooley cannot proceed against former Commissioner Cook, who does not have the capacity to provide any requested relief. *See Ex parte Young*, 209 U.S. at 157 (defendant official must have some connection with enforcement of allegedly unconstitutional act).[9] He may proceed, however, against Interim Commissioner Angel Quiros under Federal Rule of Civil Procedure 25(d). ("An action does not abate when a public officer who is a party in an official capacity ... ceases to hold office while the action is pending[,] [and] [t]he officer's successor is automatically substituted as a party."). Accordingly, the Court will instruct the clerk to serve this complaint on Angel Quiros, Warden Hannah, Dr. Valletta, and Medical Supervisor Vitale in their official capacities.

### IV.   ORDERS

The Court enters the following orders:

(1) The case shall proceed on Dooley's Eighth Amendment claims against Dr. Valletta, Jane and John Doe, Grievance Coordinators Nadeau and Olsen, Medical Supervisor Mike Vitale, Captain Hurdle, Warden Hannah, and Deputy Warden Egan in their individual capacities for damages. His Eighth Amendment claims for injunctive relief may proceed against Angel Quiros, Warden Hannah, Dr. Valletta, and Medical Supervisor Vitale in their official capacities.

All other federal claims are DISMISSED without prejudice. The claims against former Commissioner Rollin Cook and RN Angel in their individual capacities are DISMISSED without prejudice.

---

[9]   *See* https://portal.ct.gov/DOC (showing that Angel Quiros is the current Interim Commissioner).

If Dooley believes he can allege facts to cure the deficiencies identified in this ruling, he may file a motion to amend and attach an amended complaint within **thirty (30) days** from the date of this order.

(2) The clerk shall verify the current work address of Dr. Valletta, RN Cynthia Nadeau, Grievance Coordinator Olsen, Medical Supervisor Mike Vitale, Captain Hurdle, Warden Hannah, and Deputy Warden Egan with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint and any attachments to them at their confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If the defendants fail to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The clerk shall prepare a summons form and send an official capacity service packet, including the complaint and this Initial Review Order, to the United States Marshal Service. The U.S. Marshal is directed to effect service of the complaint on Angel Quiros, Warden Hannah, Dr. Valletta, and Medical Supervisor Vitale in their official capacities.

(4) The clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(5) The Clerk cannot effect service on a Doe defendant without that defendant's full name and current work address.   The plaintiff is directed to obtain this information during discovery and to file a notice containing the information with the court.   **Once a defendant Doe has been identified,  the court will order that he or she be served with a copy of the**

23

complaint.   **Failure to identify a Doe defendant will result in the dismissal of all claims
against that defendant.**

(6) The defendants shall file a response to the complaint, either an answer or motion to
dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of
summons forms are mailed to them. If the defendants choose to file an answer, they shall admit
or deny the allegations and respond to the cognizable claims recited above. The defendants may
also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed
within **six months  (180 days)** from the date of this Order. Discovery requests need not be filed
with the Court.

(8) The parties must comply with the District of Connecticut "Standing Order Re: Initial
Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be
found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed within **seven months (210 days)**
from the date of this Order.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive
motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or
the response is not timely, the dispositive motion can be granted absent objection.

(11)   If the plaintiff changes his address at any time during the litigation of this case,
Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in
the dismissal of the case. The plaintiff must give notice of a new address even if he is
incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not

24

enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(12) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 2d day of November 2020, at Hartford, Connecticut.